IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CRAIG M. CAHOON,

                              Plaintiff,                    OPINION AND ORDER

        v.
                                                           23-cv-56-wmc

SCHOOL DISTRICT OF FLAMBEAU and
ERICA SCHLEY,

                              Defendants.

        Plaintiff Craig Cahoon filed this civil action against his former employer, the School

District of Flambeau, and its District Administrator, Erica Schley, claiming that they

retaliated against him for exercising his First Amendment free speech rights by terminating

his employment as a school principal after he cooperated with a police investigation.[1]

Before the court is defendants' joint motion for summary judgment on plaintiff's free

speech claims.  (Dkt. #21.)  Because there are disputed issues of material fact as to the

circumstances surrounding plaintiff's termination, defendants' motion must be denied.

---

[1] Plaintiff also claimed that defendants deprived him of his Fourteenth Amendment due process rights when he was terminated, but the parties stipulated to dismissal of his due process claims. (Dkt. #28.)  The proper vehicle for voluntarily dismissing individual parties or claims is Federal Rule of Civil Procedure 15(a)(2), which allows a plaintiff to amend his complaint with consent of the opposing party or the court's leave, which "should be freely give[n] when justice so requires." *Taylor v. Brown*, 787 F.3d 851, 857-58 (7th Cir. 2015); *Robert L. Meinders, D.C., Ltd. v. United Healthcare Services, Inc.*, 7 F.4th 555, 559 n. 4 (7th Cir. 2021).  Accordingly, the court will construe the parties' stipulated dismissal as plaintiff's motion for leave to amend his complaint and dismiss Counts 3 and 4.

UNDISPUTED FACTS[2]

## A. Background

Plaintiff Craig Cahoon is a licensed teacher with over 20 years of experience as an educator. Defendant School District of Flambeau (the "District") operates public schools for roughly 500 students residing in parts of Rusk, Price, Taylor, and Chippewa counties in northern Wisconsin. The District is governed by a Board of Education (the "Board") comprised of seven elected members. Defendant Erica Schley is employed as its District Administrator and served in that role at all times relevant to this case.[3]

Cahoon was employed by the District as its Middle School/High School Principal ("Secondary School Principal") between July 1, 2017, and May 31, 2022. Cahoon took over this position from District Administrator Schley, who served on a committee that recommended Cahoon's hiring and approved him for the position. In his role as Secondary School Principal, Cahoon reported to Schley.[4] Between May of 2017 and May of 2019, Cahoon signed a series of two-year contracts with the District to continue serving as Secondary School Principal, each providing for progressively higher salaries.

---

[2] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings, responses, and evidence in the record.

[3] Under Wisconsin law, a "School District Administrator" is defined as "the school district superintendent, supervising principal or other person who acts as the administrative head of a school district." Wis. Stat. § 115.001(8).

[4] As for the duties of a as Secondary School Principal like Cahoon, neither party cites to any relevant language applicable to his conduct here, although the closest may be a requirement that he "[c]ommunicate with parents, administrators, and school counselors on student progress." (Dkt. #30-4, at 2.)

In February of 2020, Cahoon learned that the Board was concerned about his job performance after District Administrator Schley advised him that the Board was considering not renewing his contract.  Schley told Cahoon the Board's proposal "was just out of the blue."  (Dkt. #35, at 1.)  On February 27, 2020, the Board voted 6-1 *not* to extend Cahoon's contract for another two years beyond June 30, 2021, but notified him at that time that a formal decision to renew or not renew his contract beyond that date would be made before January 31, 2021, consistent with the Board's obligations under Wis. Stat. § 118.24.  (Dkt. #23-12.)

## B.  Grade Change Incident

On January 19, 2021, Jeffrey Schley -- who is married to District Administrator Schley -- emailed Justin Lauber, a teacher at the District's Secondary School, to complain about his daughter's grade in Lauber's physical education course, which he felt was holding her back from being at the top of her class.  In an email exchange with Lauber, Mr. Schley suggested "just resolv[ing] this if possible so we can move forward" in lieu of submitting an open records request for video tapes of Lauber's gym classes.  (Dkt. #23-2, at 2.)

Lauber responded the next day, noting that he did not offer extra credit in his gym classes and that the grade recorded for the Schleys' daughter was accurate.  Less than an hour later, Mr. Schley replied, copying Principal Cahoon and District Administrator Schley, demanding an "immediate sit-down meeting for all parties involved."  (*Id*. at 1.) Mr. Schley further stated that:  he found it "absolutely ridiculous that a low priority class such as physical education would result in [his] daughter losing class rank"; he wanted to "review all of the days that she did not receive full points"; he "was willing to take this all

the way to the school board"; and Lauber's grading seemed to be "very subjective and even gender biased." (*Id*.) Cahoon then called Mr. Schley to schedule a meeting with Lauber. The meeting took place the following day, January 21, 2021. Though the parties dispute what was said in that meeting, they agree that Lauber ultimately agreed to change the Schleys' daughter's grade, as well as the grades of other students in her class.

Sometime after January 21, 2021, Board President Julie Hauser became aware that Lauber had asked to meet with the Board regarding his interaction with Jeffrey Schley. Hauser responded to Lauber's request on January 24, 2021. She then met with Principal Cahoon and Lauber on January 28, 2021, to determine whether the issue with Mr. Schley had been resolved and whether Lauber still wanted to meet with the Board. According to Cahoon, Lauber told Hauser that he felt threatened by Mr. Schley's claims and wanted the board to be aware that they were serious and unfounded. (Cahoon Decl. (dkt. #32) ¶¶ 21-22.) Lauber also confirmed that he had retained legal counsel in connection with the matter.[5]

On February 3, 2021, Lauber filed a formal complaint with the Board, through Hauser, contending that he was coerced to change the Schleys' daughter's grade. Lauber further alleged that Board President Hauser and District Administrator Schley acted "in coordination" with Jeffery Schley, and that their conduct violated Wis. Stat. § 946.12

---

[5] The parties' proposed facts do not reference how law enforcement subsequently became aware of and began investigating the incident involving Lauber, Jeffrey Schley, and Cahoon. However, a series of police reports filed with defendants' joint motion for summary judgment suggest that a member of the Board, Michael Schuetz, contacted the Rusk County Sheriff's Office on February 2, 2021, to report that Hauser was refusing to set a special meeting of the Board -- in violation of Wisconsin state law -- despite his and Board member Linda Applebee's request for one after receiving a complaint from Lauber. (Dkt. #23-14, at 4-5.)

(misconduct in public office), § 19.45 (standards of conduct for state public officials), and § 19.46 (conflicts of interest). The District instructed its attorney to conduct an investigation into whether Hauser and Schley acted appropriately after Lauber's interaction with Jeffrey Schley regarding his daughter's grade. Cahoon claims that he then received a letter from Hauser ordering him to appear for an interview with the District's counsel, which he did on February 17, 2021. (Dkt. #23-14, at 9.) The Board addressed Lauber's complaint at a meeting that same day, although no action was taken before the meeting was adjourned.

## C. Administrative Improvement Plan

On or about February 15, 2021, Cahoon was also placed on an Administrative Improvement Plan ("AIP") that was drafted and overseen by District Administrator Schley. The AIP sought to improve Cahoon's performance as Secondary School Principal, and Cahoon recognized that it reflected the dissatisfaction of some Board members with his work. Around that same time -- the parties disagree on which event came first -- Cahoon was offered a one-year contract, with no salary increase, to continue serving as Secondary School Principal from July 1, 2021, through June 30, 2022, with the term of the AIP running through December 31, 2021.

On April 7, 2021, District Administrator Schley signed an employment verification form supporting Cahoon's application for a lifetime school administrator license from the Wisconsin Department of Public Instruction. (Dkt. #30-5.) The form, which required its signatory to verify that Cahoon's employment as Secondary School Principal "was successfully completed[,]" did not reference the AIP or Cahoon's performance in a section

5

that allowed Schley to remark on any "Exceptions, Limitations, or Other Comments[.]" (*Id.*)

**D. Sheriff's Office Interview, May 2021 Board Meeting, and Criminal Charges**

On or about March 18, 2021, Rush County Sheriff's Office Investigator Steven Gronski informed Principal Cahoon that he was looking into the incident involving the Schleys' daughter's grade.  On that same afternoon after school hours, Cahoon sat for a recorded interview with Investigator Gronski at the Sheriff's Office.  During that interview, Cahoon told Investigator Gronski that the incident with the Schleys' daughter began after Jeffrey Schley emailed Lauber asking whether there was extra credit his daughter could complete in order to obtain an "A" in his gym class.  Cahoon then described Mr. Schley's emails to Lauber and the meeting they had with Mr. Schley.

On May 14, 2021, Rusk County prosecutors filed felony criminal charges against Hauser, alleging that she committed acts of official misconduct by refusing to schedule a special meeting of the Board to discuss Lauber's concerns as required by Wis. Stat. § 120.11 and Board policy.  Hauser later showed District Administrator Schley the charges against her and expressed surprise that they had been brought.

On May 19, 2021, District Administrator Schley asked Principal Cahoon if he was aware of the criminal charges against Hauser during their weekly meeting.  Cahoon indicated that he was.  The parties dispute the full extent of what was discussed during the meeting, but they agree that District Administrator Schley criticized Cahoon for failing to mention the February 17, 2021 Board meeting during his discussions with law enforcement and suggested that "things would have been cleared up" if he had.  (Dkt. #37, at 12.)

6

Cahoon further alleges that Schley "admonished" him for having attended a special board meeting for a schoolteacher, despite two of his coworkers, elementary school principal Vince Ross and current Board President Ted Alberson, not being admonished for doing the same.

After meeting with District Administrator Schley, Principal Cahoon immediately tried contacting Investigator Gronski.  However, Investigator Gronski was unavailable, and Cahoon instead left voicemails for him and the assistant district attorney on the case, stating that he wanted to document his interaction with District Administrator Schley because he feared for his job.  Cahoon also sent Investigator Gronski a two-page typed document summarizing his contact with her and reiterating his fear that he might lose his job.  (Dkt. #32-6.)

The Board held a meeting that evening.  Cahoon contends then-Board member Jen Pestel later advised District Administrator Schley had told the Board "Cahoon has got to go," and she wished he would quit so they did not need to pay him unemployment.  (Dkt. #37, at 13.)  Schley denies making any of those statements.  (*Id.*)  However, the next day, Pestel appears to have sent the Rusk County Sheriff's Office an email claiming that the Board violated open meeting laws by discussing "the termination of Craig [C]ahoon on the down low and behind closed doors specifically because of his cooperation in you[r] investigation regarding Julie Hauser."  (Dkt. #32-7.)

Cahoon also contends -- and District Administrator Schley disputes -- that his AIP "only" contained six incidents of allegedly deficient job performance before the May 19, 2021 meeting -- two of which involved events predating the AIP and three of which

addressed teacher licensure issues that were resolved.  (Dkt. #37, at 14.)  However, in the period following the May 19 meeting, Cahoon identified 21 more incidents of allegedly deficient job performance reported in his AIP.  (*Id*. at 15.)

On June 2, 2021, prosecutors filed a misdemeanor disorderly conduct charge against Jeffrey Schley in connection with his conduct towards Lauber and Cahoon.  On June 23, 2021, prosecutors also filed felony criminal charges against District Administrator Schley, alleging that she committed official misconduct by attempting to obtain a dishonest advantage for another.  The charges against District Administrator Schley were later withdrawn but then refiled in February of 2022, specifically naming Cahoon as a victim in the complaint.

### E.  December 2021 Student Disciplinary Incident

On or about December 15, 2021, two middle school students at the Secondary School were involved in a fight in the boys' locker room.  Principal Cahoon personally responded to the altercation and located the student who had caused it, after which law enforcement officers responded to the incident as well.  Cahoon issued an out of school suspension to the student who initiated the assault.

According to Cahoon, he recorded the incident and his follow-up in his daily log, which District Administrator Schley had access to as part of his AIP.  He also purports to have personally notified her about the December 15 assault approximately a week later. Schley was further copied on a December 21, 2021 email from a Secondary School teacher stating that one of her students -- who the parties concede is the student who initiated the assault -- would be serving an out-of-school suspension the following day.  Finally, Cahoon

emailed other District employees about disciplining that student, noting that he "struggle[d] with writing code violations on [middle school] students for [middle school] stuff." (Dkt. #29, at 13.)   However, the parties dispute whether Principal Cahoon completed *and* signed a disciplinary referral for that student as required by District policy.

### F.  Review of Cahoon's Performance as Principal

On January 12, 2022, District Administrator Schley conducted a formal evaluation of Principal Cahoon's job performance.  Though the parties disagree on how often Schley and Cahoon met to discuss the AIP while it was in place, as well as on the accuracy of Schley's assessments, it is undisputed that Schley largely characterized Cahoon's performance as "unsatisfactory" or "developing/basic".  (Dkt. #29, at 14.)

In addition, the District separately hired Jim Smasal, a retired school superintendent, to evaluate Principal Cahoon and the broader Secondary School environment.  Smasal shadowed Cahoon for roughly two days in January or February of 2022.  According to Cahoon, after Smasal advised that he was aware Cahoon had spoken to law enforcement, Smasal then said to him, "Shame on you!" (Dkt. #29, at 14.) Cahoon recalls telling Smasal in response that he had been called by the Rusk County Sheriff's Office after a Board member had filed a complaint, to which Smasal further responded, "Shame on them[,] but you didn't have to talk to them." (*Id.*) Cahoon then contends he told Smasal that he had been raised to be honest with law enforcement, to which Smasal allegedly responded, "Whatever." (*Id.*)

### G. Cahoon's Contract Non-Renewal

On January 12, 2022, the Board voted unanimously not to extend Cahoon's contract for an additional year. Cahoon was formally notified of the Board's decision in a letter from Board President Hauser dated that same day, which advised him that his last day of employment with the District would be June 30, 2022. In a separate letter from Hauser, Cahoon was also provided with preliminary notice of consideration of nonrenewal of his contract pursuant to Wis. Stat. § 118.24 and advised that he could request a hearing before the Board regarding the nonrenewal. Cahoon did so, and a meeting was scheduled for February 22, 2022.

At the February 22nd Board meeting, Cahoon alleges that he was issued a warning -- threatening his removal from the meeting -- after saying he believed the non-renewal of his contract was retaliation for having spoken to law enforcement. Cahoon also provided the Board with 198 pages of written materials disputing the grounds of his non-renewal, including a point-by-point refutation of District Administrator Schley's comments on his AIP. Three other witnesses testified on Cahoon's behalf.

District Administrator Schley, in turn, provided the Board with written materials regarding Cahoon's non-renewal as well, stating that she lacked confidence in continuing Cahoon's employment based on his performance. Schley further advised that Cahoon had not told her about the December 2021 student disciplinary incident in the Middle School. Smasal was also present at the Board meeting and advised that he agreed with the non-renewal. After convening in closed session, five members of the Board -- including Hauser -- voted to not renew Cahoon's contract for the 2022-23 school year, with one member

abstaining.  Cahoon then received a letter from the Board, signed by Hauser and the Board's clerk, advising him that his contract was not renewed due to the Board's "lack of confidence in continuing [his] employment based upon [his] performance." (Dkt. #29, at 19.)  Cahoon was placed on paid administrative leave through the end of the 2021-22 school year on February 23, 2022.  (Dkt. #32-8.)

### H. Cahoon's Termination

On May 4, 2022, District Administrator Schley met with Cahoon to discuss the December 2021 student disciplinary incident.  Schley purportedly wanted to know whether a report had been written about the incident; whether any discipline was imposed; and why Cahoon had not told her about it.  According to Cahoon, he told Schley that he had informed her of the incident.  (Dkt. #37, at 20.)  Cahoon further contends that Schley refused him an opportunity to look for materials that would corroborate his claim.  (*Id.* at 20-21.)

Less than three weeks later, District Administrator Schley sent Cahoon a letter notifying him that a special meeting of the Board was scheduled for May 31, 2022.  Schley further advised that she would recommend that the Board terminate Cahoon's employment due to his failure to address and notify her of the December 15, 2021 student disciplinary incident.  Cahoon and Schley both made presentations at the May 31 Board meeting.  Afterwards, the Board went into closed session and voted 6-1 to terminate Cahoon's employment with the District immediately.  (Dkt. #23-27, at 2.)

The criminal charges arising out of Jeffrey Schley's interaction with Lauber and Cahoon were all dropped in the following months.  The charges against Hauser were

dismissed on August 22, 2022.  (Dkt. #23-32.)  The refiled charges against District Administrator Schley were dismissed on September 26, 2022.  (Dkt. #23-33.)  Finally, the charge against Mr. Schley was formally dismissed on October 17, 2022.  (Dkt. #23-34.)

## OPINION

Government employees do not "sign away their free speech rights when answering the call to public service." *Kingman v. Fredrickson*, 40 F.4th 597, 601 (7th Cir. 2022).  The First Amendment prevents a government employer from retaliating against an employee for speaking as a citizen on matters of public interest.  *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013).  A claim for First Amendment retaliation has three elements:  (1) the employee engaged in constitutionally protected speech; (2) he suffered a deprivation because of his employer's action; and (3) his protected speech was a motivating factor in the decision to take retaliatory action.  *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020).

Individual defendants can only be held liable under 42 U.S.C. § 1983 when they are personally involved in the alleged constitutional deprivation.  *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).  While "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances[,]" it follows that a school district can only be held liable for "officially sanctioned or ordered" acts, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), or for the actions of an official with final policymaking authority.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122-23 (1988).  Whether an official has final policymaking authority is a question of state law.  *Id.*

Plaintiff claims that he engaged in protected speech by speaking to Investigator Gronski "in his role as a private citizen" about "a matter of significant public concern" and

for which he was then subject to retaliation by both defendant Schley and the Board. (Dkt. #31, at 3-4.) While defendants concede for purposes of summary judgment that plaintiff has sufficiently alleged actionable deprivations with respect to his contract's non-renewal and termination (dkt. #25, at 4), defendants advance two theories entitling them to summary judgment: (1) plaintiff's conversation with Investigator Gronski lacked constitutional protection because they spoke about matters within the scope of his official duties; and (2) plaintiff's speech was not a but-for cause of the adverse actions that defendants took against him. The court analyzes each of these elements in turn, viewing all facts and drawing all inferences in the light most favorable to plaintiff as the nonmoving party. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017).

## I.  Protected Speech

Because plaintiff was a public school principal, the court must first determine whether he met with Investigator Gronski as a public employee pursuant to his official duties, *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), or as a private citizen addressing matters of public concern, *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008), or both. The Supreme Court and Seventh Circuit have emphasized that the "threshold inquiry" in this area focuses on "the nature of the speech at issue." *Kingman*, 40 F.4th at 601 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022)). If a public employee speaks pursuant to his "official duties," the First Amendment "generally will not shield the individual from an employer's control and discipline because that kind of speech is -- for constitutional purposes at least -- the government's own speech." *Kennedy,* 597 U.S. at 527 (citing *Garcetti*, 547 U.S. at 421). However, if the government employee speaks as a

private citizen on a matter of public concern, the First Amendment inquiry is more complex and requires courts to "engage in 'a delicate balancing of the competing interests surrounding the speech and its consequences.'" *Id.* (quoting *Garcetti*, 547 U.S. at 423). Whether the Constitution protects particular speech is a question of law appropriate for resolution at summary judgment. *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007)

The only statements on which plaintiff claims he suffered wrongful retaliation are those made to Investigator Gronski on March 18, 2021. Defendants argue that plaintiff's retelling of the interactions he had with Lauber and Jeffrey Schley fell within the "general ambit" of his role as Middle/High School principal. (Dkt. #25, at 4-5 (citing *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009)).). However, the fact that plaintiff's statements certainly bore *some* relation to the subject matter of his job is not dispositive. For plaintiff's speech to lack constitutional protection, it must constitute "'government employees' work product' that has been 'commissioned or created' by the employer." *Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013) (quoting *Garcetti*, 547 U.S. at 422). Here, in contrast, plaintiff contends that he spoke with law enforcement at Investigator Gronski's request, after normal work hours and at the Sheriff's Office. (Dkt. #31, at 3.) Plaintiff further argues that giving statements to law enforcement agencies was not part of his formal job description or "implemented in actual practice in accord with" his employer's "real rules and expectations." (*Id.* (quoting *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2016)).)

The question is a close one. By characterizing plaintiff's speech as part of his "official duties," the District and District Administrator Schley make the "best contrary

14

argument" that the defendants in another school administrator speech case, *Adams v. Bd. of Educ. of Harvey Sch. Dist. 152*, 968 F.3d 713, 716 (7th Cir. 2020), had waived on appeal. There, a school superintendent contacted police to report a member of the school board had told her that she was "itching for an ass-kicking" after seeking the board's approval for a forensic audit of the district's expenditures. *Adams*, 968 F.3d at 714.  The defendants in *Adams* belatedly argued that she spoke with law enforcement pursuant to her official duties as superintendent. *Id.* at 716.  However, the Seventh Circuit determined that despite the superintendent's "mixed motive -- personal in part and professional in part" in reporting the board member's threat to law enforcement, "that [did] not render her speech unprotected." *Id*. at 716 (citing *Kristofek v. Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2014)).  Nor was the superintendent's speech a purely "personal grievance" that would be the subject of state law, rather than the First Amendment. *Id.*  Because "constituents could be influenced by news that one of their representatives proposed to substitute violence for the normal process of voting," and the implication that "an important public institution was not working properly[,]" Adams's statement to the police related to a legitimate subject of public concern, subjecting it to First Amendment protection. *Id.* at 715 (citing *Chrzanowski*, 725 F.3d at 734).

Adams is particularly instructive here.  Even if plaintiff's speech was broadly related to his professional duties as Secondary School Principal, the content of his statements -- suggesting that Jeffrey Schley may have coerced Lauber into changing his daughter's grade because of his wife's role as District Administrator and Hauser's subsequent involvement in the matter -- undoubtedly also involves a matter of public concern. *E.g., Miller v. Jones*,

444 F.3d 929, 936 (7th Cir. 2006) ("Our cases have consistently held that speech alleging government malfeasance addresses matters of public concern in its substance."); *Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance.").

At the same time, the record contains no evidence suggesting that plaintiff's statements to law enforcement were "work product" that was "commissioned or created" by defendants, even though plaintiff's original role as principal meditating a dispute between a student's parent and teacher certainly fell within that scope. *Garcetti*, 547 U.S. at 422. Again, in deciding whether a public employee's speech is protected under the First Amendment, the court must consider the "content, form, and context of the contested statement, as revealed by the whole record." *Kingman*, 40 F.4th at 602 (citing *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004)). The Seventh Circuit has highlighted the importance of context where a statement was made "not [in] a large urban area like Chicago or an expansive department or agency like the Department of Defense, but instead a small town in the middle of America -- the City of Rhinelander, Wisconsin." *Id*. Here, plaintiff's statements to law enforcement were made in an *even smaller* town than Rhinelander. Even if his speech was not compelled by a subpoena, in which case it would be presumptively protected, *Chrzanowski*, 725 F.3d at 741-42, it is undisputed that plaintiff spoke with Investigator Gronski -- at the Sheriff's Office, after school hours -- at the investigator's request in the context of a criminal investigation involving public officials. As much as defendants may have preferred that plaintiff had contacted them in advance (and even had the District's attorney represent them and plaintiff at any interview), the court recognizes

16

the inherent conflicts plaintiff faced in involving his employer (at least one of whom was arguably directly implicated by the District Attorney in a criminal investigation by virtue of a marital relationship with the parent under investigation), and cannot say his decision to speak voluntarily is unworthy of protection under the First Amendment despite his presence at the events underlying the criminal investigation being part of his job description as Secondary School Principal.[6]

## II. Actionable Deprivations

Because plaintiff's speech to the investigator was protected by the First Amendment, however, does not mean plaintiff was retaliated against for that speech.  To begin, for purposes of a First Amendment retaliation claim, any deprivation that is likely to deter the exercise of free speech is actionable.  *Spiegla*, 371 F.3d at 941 (citing *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982)).  As noted already, defendants do not dispute (at summary judgment at least) that two of the five deprivations plaintiff alleges he experienced are adverse enough on their face to support a First Amendment retaliation claim.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) (contract non-renewal); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006)

---

[6] The court may have reached a different conclusion had there been evidence that during plaintiff's prior visit with counsel for the District, that attorney had explained to plaintiff that he was not just representing the District *but also plaintiff* with respect to the District's investigation or any other investigation that might ensue.  Even then, however, unless plaintiff had expressly agreed to that representation and the District or its counsel had directed plaintiff to *notify* the District of his intent to meet with the Sheriff's Office, this would not remove the independent, public nature of plaintiff's decision to speak with Investigator Gronski.

(termination).  The court analyzes the three remaining deprivations alleged by plaintiff below.

*First*, plaintiff contends that he was threatened with termination shortly after defendant Schley learned about his statement to Investigator Gronski.  As evidence of that threat, plaintiff points to a May 19, 2021 Board meeting, where defendant Schley allegedly sought to fire him.  (Dkt. #31, at 5.)  Though defendants' briefing does not explicitly advance a contrary argument, they contend that plaintiff lacks admissible evidence in the record to prove that his employment was threatened at the May 19 meeting.  (Dkt. #34, at 6.)

However, plaintiff *has* adduced sufficient admissible evidence for a reasonable juror to infer that his employment was threatened after defendant Schley learned about his conversation with Investigator Gronski.  In particular, evidence that is presented in a "self-serving" affidavit can thwart summary judgment unless it "fails to meet the usual requirements of any other form of evidence at the summary judgment stage."  *Foster v. PNC Bank*, 52 F.4th 315, 320 (7th Cir. 2022).  Here, defendant Schley's alleged statement to the Board that "Cahoon has got to go" is admissible as the statement of a party opponent.  Fed. R. Evid. 801(d)(2)(A).  Although Cahoon's personal knowledge of that statement comes from Board member Jen Pestel, and therefore counts as hearsay within hearsay, her statement to Cahoon is also independently admissible as the statement of a party opponent by virtue of her membership on the District's board.  Fed. R. Evid. 801(d)(2)(D); Fed. R. Evid. 805.  Moreover, Pestel's email to the Sheriff's Office alleging that the Board was using the meeting to discuss plaintiff's termination "on the down low" is also admissible as

18

the statement of a party opponent.  Whether those statements are credible is a matter for a jury to decide, just as is the question of whether the Board ultimately acted adversely against plaintiff because of his protected statements to the investigator, in whole or in part, or for other, legitimate reasons.

Although an "unfulfilled threat[] that result[s] in no material harm cannot be considered an adverse employment action," *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004), it is undisputed that plaintiff *was* ultimately terminated.  Regardless, this court has previously concluded that threats to fire an employee can be sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights. *Brown v. Hanson*, No. 16-cv-346-bbc, 2017 WL 2635290, at *5 (collecting cases) (W.D. Wis. June 19, 2017).  Here -- where defendant Schley allegedly sought to terminate plaintiff's employment behind closed doors at a Board meeting shortly after learning about his cooperation with law enforcement, and ultimately managed to do so -- that threat is enough to be actionable.

*Second*, plaintiff contends that he was subjected to enhanced scrutiny under his AIP after engaging in protected speech.  (Dkt. #31, at 5-6.)  Defendants, in turn, note that plaintiff was already on notice that his job extension was in jeopardy in 2020, well before he was placed on an AIP in February of 2021, arguing these facts preclude a reasonable jury from finding *any* connection between the AIP and plaintiff's protected speech.  While the mere existence of plaintiff's AIP -- which predated his protected speech -- is not actionable, defendant Schley's increased enforcement after she learned about his conversation with Investigator Gronski may be.  More specifically, on their own, "unfair

reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010). However, the Seventh Circuit has also emphasized that "context matters to the determination of what constitutes a materially adverse action," and a negative performance evaluation could be adverse if it precedes termination closely enough. *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 741 (7th Cir. 2011), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016) (citing *Burlington Northern & Santa Fe Railway. Co. v. White*, 548 U.S. 53, 69 (2006)). Given the disputes of fact as to why the number of events recorded in plaintiff's AIP increased nearly fourfold after his May 19, 2021 meeting with defendant Schley and the role the AIP played in his termination, a reasonable juror could find that they were related to plaintiff's protected speech.

*Third*, the parties disagree on whether plaintiff's paid administrative leave was sufficiently adverse as to deter free speech. Here, defendants contend that Seventh Circuit caselaw forecloses that possibility. (Dkt. #25, at 5 (citing *Nichols v. S. Illinois Univ. Edwardsville*, 510 F.3d 772, 776 (7th Cir. 2007)).) Plaintiff responds that because his leave included a ban from campus, full availability for work notwithstanding his suspension, and ongoing conduct obligations, defendants did much more than just place him on paid administrative leave alone. (Dkt. #31, at 6 (citing *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 2015 WL 3791458 (E.D. Wis. June 18, 2015)).) Though this, too, presents a close question, a reasonable juror *could* again find that plaintiff's paid administrative leave was an actionable deprivation.

As in *Ferrill*, where a school board placed a teacher on paid leave shortly after her contract was non-renewed, plaintiff was placed on his leave *one day* after the non-renewal of his contract, which itself had been decided at a meeting where plaintiff had raised his concerns on the Board's actions.   Thus, these actions might be seen as retaliatory. Moreover, unlike the challenged leave in *Nichols* -- which was limited to the period during which an officer's fitness-for-duty psychological examinations were pending -- plaintiff's indefinite leave here was tantamount to termination, coming roughly four months before the end of his already non-renewed contract.

## III. Causation

Because each of plaintiff's five alleged adverse employment actions is actionable for purposes of his First Amendment claim, the court next analyzes whether a reasonable jury could find that plaintiff's protected speech caused any of those actions.   The causation element of a retaliation claim has historically been viewed under a split burden of proof, although the Seventh Circuit has been critical of this approach in recent years, preferring to think about the evidence as a whole in deciding whether a reasonable jury could find causation.  *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz*, 834 F.3d at 764-66).  Upon either approach, plaintiff has offered enough proof of causality for this matter to go forward to trial under either method.

Beginning with the more traditional burden shifting approach, as do the parties, plaintiff has the initial burden to establish a prima facie case of retaliation by showing that his protected speech was a motivating factor in the adverse action taken against him.  *Mt. Healthy*, 429 U.S. at 287.  This evidence can be direct *or* circumstantial.  *FKFJ, Inc. v. Vill.*

21

*of Worth*, 11 F.4th 574, 586 (7th Cir. 2021).   Circumstantial evidence may include suspiciously close timing between the speech and the adverse action as already discussed, procedural irregularities, changing explanations for an adverse action, or different treatment of similarly situated people.  *Kidwell v. Eisenhauer*, 679 F.3d 957, 965–66 (7th Cir. 2012).   Still, plaintiff must provide *enough* evidence to make his contention of retaliatory motive more than speculative.  *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013).  If plaintiff meets his burden of showing a retaliatory motive, then the burden shifts to defendants to show that they would have taken the same action even if plaintiff had not engaged in the protected speech.  *Mt. Healthy*, 429 U.S. at 287.  However, if plaintiff identifies some evidence showing that the explanation for that action was pretextual, "the persuasiveness of [the] employer's non-retaliatory explanation" would be for a factfinder to assess.  *Massey v. Johnson*, 457 F.3d 711, 719 (7th Cir. 2006); *Sweet v. Town of Bargersville*, 18 F.4th 273, 278 (7th Cir. 2021).

As discussed above, plaintiff identified five allegedly retaliatory actions that defendants took against him.  For ease of analysis, the court construes them as three separate sets of events:  (a) organizing a Board meeting to discuss his termination "behind closed doors"; (b) "ratcheting up" his AIP after learning he spoke with Investigator Gronski; and (c) declining to renew his contract, placing him on paid administrative leave and subsequently terminating him.  (Dkt. #31, at 9.)  The court addresses each in turn.

## A.  May 19, 2021 Board Meeting

Plaintiff contends that defendant Schley allegedly sought his termination at the Board meeting on May 19, 2021, because of his conversation with Investigator Gronski.

The extremely short interval -- roughly one day -- between when Schley allegedly learned about plaintiff's participation in the Sheriff's Office investigation, her remarks that "Cahoon has got to go[,]" and Pestel's email complaining that the Board was "discuss[ing] plaintiff's termination behind closed doors[,]" all give rise to a reasonable inference of retaliation. *Culver v. Gorman*, 416 F.3d 540, 546 (7th Cir. 2005) (72-hour interval establishes inference of causal link between protected expression and adverse action).

Neither defendant Schley nor the defendant District have provided *any* non-retaliatory explanation for their actions with respect to the May 19 Board meeting, let alone argued that plaintiff's allegedly sub-standard performance as Secondary School Principal caused them.  Instead, defendants dispute having even *made* the statements or taken the actions plaintiff alleges they did.  (Dkt. #37, at 13.)  Accordingly, defendants are not entitled to summary judgment with respect to that alleged deprivation.

### B.  Increased AIP Enforcement

Plaintiff next argues that defendants subjected him to enhanced scrutiny under the AIP after learning of his conversation with Investigator Gronski.  As with their argument on the deprivation prong, defendants contend that the AIP was entirely unrelated to plaintiff's speech, but instead the result of his shortcomings as an administrator.  As a threshold matter, plaintiff has not identified any evidence suggesting that the defendant District made an official decision to "ratchet[] up" his AIP; rather, his brief only identifies retaliatory actions allegedly taken by defendant Schley.  (Dkt. #31, at 9.)  However, the District can be held liable under § 1983 for decisions made by those to whom it delegates "final policymaking authority."  *Pembaur*, 475 U.S. at 480, 483.  Since the District does

23

not dispute that District Administrator Schley had that authority, the court cannot enter summary judgment in the District's favor using a defense that it failed to raise in its briefing and to which plaintiff lacked an opportunity to respond.  As the court noted above, there are disputed facts as to *why* the number of events recorded in plaintiff's AIP increased nearly fourfold after his May 19, 2021, meeting with defendant Schley, as well as what role, if any, the AIP played in his termination.  As a result, a jury must determine whether defendant Schley's non-retaliatory explanation for the uptick in plaintiff's disciplinary scrutiny is credible.

### C. Contract Non-Renewal, Paid Administrative Leave, and Termination

Finally, plaintiff contends that defendant Schley advocated for -- and the District, through the Board, approved -- his contract non-renewal and eventual termination.  (Dkt. #31, at 9.)  A broad reading of plaintiff's response also suggests that both Schley and the Board were responsible for placing him on paid administrative leave.  Although defendants reply that decisions regarding non-renewal, paid administrative leave, and termination are solely within the discretion of the Board (dkt. #34, at 9), defendants can both be liable under § 1983 if Schley was personally involved with causing the Board's decisions.  *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019).  In light of Schley's recommendations to the Board regarding non-renewal (dkt. #37, at 18) and termination (*id.* at 21), as well as a February 25, 2022 letter she signed confirming that she had placed plaintiff on paid administrative leave (dkt. #32-8), there is sufficient evidence for a reasonable jury to find that *both* defendants were personally involved with all three of the adverse actions

24

attributed to defendants, as well as that those actions were motivated by his protected speech.

In most retaliation cases, "the time period between the protected activity and the adverse action must be very close" -- typically days, rather than weeks or months. *Kingman*, 40 F.4th at 603 (quoting *Kidwell*, 679 F.3d at 966). Here, defendants contend that plaintiff's termination -- which took place over a year after his conversation with Investigator Gronski and three months after his non-renewal -- could not have been motivated by his protected activity. (Dkt. #34, at 5-6.) However, the Seventh Circuit has also suggested that circumstantial evidence of retaliation can overcome that presumption. *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996) (summary judgment is inappropriate when a finder of fact could reasonably infer that an employer "waited in the weeds for five or ten years" before retaliating against employee). In particular, a retaliation claim can be established by proving "a chronology of events from which retaliation may be inferred." *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). A reasonable factfinder may struggle to conclude that, standing alone, defendants' actions were retaliatory when they took place nearly eleven months (non-renewal and paid leave) and fourteen months (termination) after plaintiff's cooperation with law enforcement, but the court must consider the record as a whole. Drawing all reasonable inferences in plaintiff's favor, a jury could find that because of his protected speech in March of 2021: (1) defendant Schley sought his termination at a Board meeting in May of 2021, motivated by President Hauser's very recent arrest on felony charges, arguably precipitated by or at least advanced by plaintiff's exercise of his First Amendment rights; (2) defendant Schley used plaintiff's

preexisting AIP as a pretext for recommending his non-renewal, given the increase in negative findings that began after that Board meeting and her own arrest the following month, which culminated in his negative performance evaluation in January of 2022; (3) defendant Schley's negative reviews caused the Board to vote in favor of plaintiff's contract nonrenewal and paid leave in February of 2022; and (4) defendant Schley used the December 2021 student disciplinary incident -- and plaintiff's alleged failure to comply with District policy afterwards -- as a pretext to recommend his preordained termination in May of 2022, which the Board approved shortly thereafter.

At trial, defendants may certainly argue that plaintiff's contract was non-renewed because of his poor performance over a lengthy period that began *before* he spoke with Investigator Gronski and terminated because of his violation of District policies.  (Dkt. #34, at 7-8.)  Defendants also dispute that Schley's signature on plaintiff's Wisconsin Department of Public Instruction employment verification form meant that she certified his work as principal had been "successfully completed" as of April 7, 2021.  (Dkt. #37, at 18.)  However, given the plausible chronology plaintiff has credibly put together, *and* the disputes of fact surrounding comments made by defendant Schley, members of the Board, and the District's hired consultant, Jim Smasal, summary judgment is not appropriate at this juncture.[7]   A jury will need to resolve "the persuasiveness of an employer's non-retaliatory explanation" for plaintiff's termination.  *Massey*, 457 F.3d at 719.

---

[7] As an agent of the District, Smasal's alleged statements would also be admissible as statements of a party opponent.  Fed. R. Evid. 801(d)(2)(D).

ORDER

IT IS ORDERED that:

1)  Defendants' joint motion for summary judgment (dkt. #21) is DENIED.

2)  The parties' stipulated dismissal of plaintiff's due process claims (dkt. #28), which the court construes as plaintiff's motion for leave to amend his complaint, is GRANTED.

3)  Counts 3 and 4 of plaintiff's complaint (dkt. #1) are DISMISSED with prejudice and without costs to any party.


Entered this 18th day of June, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

27